IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | | |
|---|---|---|
| Daphne Radley, | ) | |
| | ) | Civil Action No. 6:13-569-RMG-KFM |
| Plaintiff, | ) | |
| | ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. | ) | |
| | ) | |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

　　　　　　　This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) DSC, concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[2] The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. 405(g)) to obtain judicial review of a final decision of the Commissioner of Social Security finding that she became disabled as of March 17, 2011, but denying her claim for disability insurance benefits under Title II of the Social Security Act prior to that date.

## ADMINISTRATIVE PROCEEDINGS

　　　　　　　The plaintiff filed an application for disability insurance benefits ("DIB") on April 24, 2008, alleging that she became unable to work on September 8, 2005. The alleged onset date was later amended to April 5, 2006 (Tr. 61). The application was denied initially and on reconsideration by the Social Security Administration. On November 6, 2008, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff

---

[1] Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration on February 14, 2013. Pursuant to Fed.R.Civ.P. 25(d), Colvin should be substituted for Michael J. Astrue as the defendant in this case.

[2] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

and Karl S. Weldon, an impartial vocational expert, appeared on September 29, 2009, considered the case *de novo*, and on December 22, 2009, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended.  The plaintiff filed an appeal with the Appeals Council, which granted the request for review under the substantial evidence and error of law provisions of the Social Security Administration regulations (20 C.F.R. § 404.970).  Under the authority of 20 C.F.R. § 404.977, the Appeals Council vacated the hearing decision and remanded the case to the ALJ for further proceedings. Consequently, the plaintiff appeared and testified at a second hearing on August 16, 2011, in Greenville, South Carolina.  Mark Leaptrot, an impartial vocational expert, also appeared at the hearing.  The plaintiff filed a subsequent claim for Title II benefits on June 29, 2010. The ALJ associated the two claim files and issued a new decision on the associated claims on October 6, 2011.  In the new decision, the ALJ found the plaintiff disabled for the period beginning March 17, 2011, but denied benefits for the period prior to that date.  The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on January 2, 2013.  The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits prior to March 17, 2011, the Commissioner has adopted the following findings of the ALJ:

> (1)    The claimant meets the insured status requirements of the Social Security Act through December 31, 2011.
>
> (2)    The claimant has not engaged in substantial gainful activity since the alleged onset date (20 C.F.R §§ 404.1571 *et seq*.).
>
> (3)    Since the alleged onset date of disability, September 8, 2005,[3] the claimant has the following severe impairments:

---

[3]The plaintiff amended her alleged onset date of disability to April 5, 2006, at the September 2009 hearing (Tr. 61; *see* Tr. 19 (ALJ notes the amended onset date in decision but thereafter uses previous alleged onset date)).  The discrepancy does not appear to have any bearing on the issues

2

refractory right hip bursitis and tendonitis; sciatic nerve injury on the right; degenerative disc disease of the lumbar spine; depression; anxiety; and possible bipolar disorder (20 C.F.R. § 404.1520(c)).

(4)     Since the alleged onset date of disability, September 8, 2005, the claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).

(5)     After careful consideration of the entire record, I find that since September 8, 2005, the claimant has the residual functional capacity to perform less than the full range of light work as defined in 20 C.F.R. § 404.1567(b).  The claimant could lift/carry up to 20 pounds at one time and lift/carry up to 10 pounds occasionally.  The claimant could sit, stand, and walk up to six hours total out of an eight-hour workday.  The claimant requires the opportunity to change between sitting and standing positions.  The claimant could never climb ladders.  The claimant could push/pull with the lower extremities on an occasional basis.  The claimant could climb ramps and stairs, balance, stoop, crouch, kneel[], and crawl on an occasional basis.  The claimant should avoid concentrated exposure to workplace hazards and vibrations.  Because of pain, side effects of medications, and mental impairment, the claimant is limited to unskilled work.  The claimant could interact with the general public on an occasional basis.

(6)     Since September 8, 2005, the claimant has been unable to perform any past relevant work (20 C.F.R. § 404.1565).

(7)     Prior to the established disability onset date, the claimant was an individual closely approaching advanced age.  On March 17, 2011, the claimant's age category changed to an individual of advanced age (20 C.F.R. § 404.1563).

(8)     The claimant has a limited education and is able to communicate in English (20 C.F.R. § 404.1564).

(9)     Prior to March 17, 2011, transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant

_____

presented herein.

3

has transferable job skills. Beginning on March 17, 2011, the claimant has not been able to transfer job skills to other occupations (*See* SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

(10)    Prior to March 17, 2011, the date the claimant's age category changed, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 C.F.R. §§ 404.1569 and 404.1569(a)).

(11)    Beginning on March 17, 2011, the date the claimant's age category changed, considering the claimant's age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that the claimant could perform (20 C.F.R. §§ 404.1560(c) and 404.1566).

(12)    The claimant was not disabled prior to March 17, 2011, but became disabled on that date and has continued to be disabled through the date of this decision (20 C.F.R. § 404.1520(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of

4

five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. § 404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* § 404.1520(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy that the plaintiff can perform despite the existence of impairments that prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See *Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith*

*v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)).  The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964).  If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

### Treatment Records

The plaintiff alleged that her hip and lower back pain started when she fell down at her job in 2003.  A July 2003 back x-ray and physical exam immediately after the fall were normal (Tr. 675-76).  The plaintiff briefly saw Dr. Douglas Reeves at Blue Ridge Orthopedics after the injury, but did not return until November 2005, when she complained of hip pain (Tr. 704).  She denied back pain, and a hip MRI taken on November 23, 2005, was normal except for probable herniation pit within the left femoral neck-head junction (Tr. 678, 703, 708).  X-rays and a neurological exam were normal (Tr. 703-704).

On November 29, 2005, Dr. Reeves evaluated the plaintiff for continued pain.  Dr. Reeves noted that the plaintiff's pain did not appear to correlate with her MRI findings, and he wanted to wait for Dr. Brian Redmond's opinion.  The plaintiff reported having anxiety type attacks possibly from Lortab, and Dr. Reeves switched her medication to Ultram (Tr. 703).

6

On January 3, 2006, Dr. Redmond noted that his reading of the MRI showed increased fluid and tissue swelling in the right hip trochanteric bursa and around the tendons there (Tr. 702). On February 8, 2006, Dr. Redmond noted that Lyrica had helped with the plaintiff's achy and throbbing pain in her lower leg, which indicated that there was a nerve component. The plaintiff continued to have exquisite tenderness and pain in her direct lateral hip in the area of the bursa. Dr. Redmond indicated that the plaintiff was "very dramatic in her pain," which was somewhat out of proportion for the type of problem she had. Dr. Redmond gave the plaintiff a diagnostic injection into her hip bursa (Tr. 701). On March 2, 2006, Dr. Redmond evaluated the plaintiff for right hip bursitis. Dr. Redmond noted that the plaintiff was continuing to work in pain. The plaintiff received only short periods of relief from her prior injections and Dr. Redmond offered arthroscopic debridement. Dr. Redmond estimated a 70 to 80% chance of success with this surgical option (Tr. 700). On March 23, 2006, Dr. Redmond evaluated the plaintiff for continued right lateral thigh pain. He indicated that due to the duration and refractory nature of the plaintiff's pain, it was decided to proceed with arthroscopic debridement (Tr. 443-44). On April 6, 2006, Dr. Redmond performed a right hip arthroscopy with IT band tenotomy and bursectomy (Tr. 441-42).

The plaintiff participated in physical therapy between April 20, 2006, and December 19, 2006 (Tr. 746-56). On May 23, 2006, examination revealed "excellent" hip range of motion; however, the plaintiff still complained of hip pain, and Dr. Redmond recommended physical therapy (Tr. 693, 695). In June 2006, Dr. Redmond noted the plaintiff was "getting stronger," had "improved range of motion, less pain and is completing and working hard with physical therapy" (Tr. 691). On July 27, 2006, the plaintiff had more numbness and radiating pain from her right hip and decreased light touch and pinprick sensation in her anterior and lateral thigh down just below the knee, medial to the knee. Dr. Redmond diagnosed continued neuropathic neurogenic pain. He noted that the plaintiff

7

had improvement in strength and motion.  Dr. Redmond wrote for the plaintiff to continue out of work (Tr. 689-90).

On August 4, 2006, the plaintiff had a lumbar spine MRI that showed a mild central protrusion at L5-S1 and a small right foraminal protrusion at L4-L5 (Tr. 677).

On August 24, 2006, Dr. Redmond noted that the plaintiff's back pain was worse and her hip pain was starting to throb again.  The plaintiff felt Lyrica was no longer helping.  The plaintiff continued to have occasional radiating pain down her right leg.  Dr. Redmond noted the plaintiff had some mild disc protrusion on the right in her low back and some degenerative disc disease with mild facet hypertrophy (Tr. 688).  On September 28, 2006, Dr. Redmond indicated that the plaintiff's hip pain had worsened and she had not progressed well with physical therapy.  Dr. Redmond diagnosed refractory hip pain and nerve entrapment from low back problems.  Dr. Redmond planned an epidural injection (Tr. 687).

On November 6, 2006, the plaintiff was treated at the Rosa Clark Medical Clinic ("RCMC") for migraine headaches.  It was noted that the plaintiff had also been involved in an automobile accident that morning without reported injuries (Tr. 669).

On November 16, 2006, Dr. Redmond noted that the epidural injection had helped the plaintiff's back some but not her hip, which continued to be "very painful, very bothersome."  The plaintiff reported falling several times because of gait weakness, which made her pain worse.  The plaintiff had a moderate limp and significant pain over her arthroscopic portals even though they were well-healed.  Dr. Redmond ordered additional physical therapy (Tr. 686).  On December 19, 2006, the plaintiff's pain was radiating down her leg to her ankle.  The plaintiff's pain was "positional" and got worse with certain activities.  Dr. Redmond stated that the plaintiff's pain was "a little out of proportion to her persisting anatomic complaints of her hip, but I do think her back is playing a significant role

8

there." Dr. Redmond referred the plaintiff to a pain clinic (Tr. 684). Dr. Redmond wrote for the plaintiff to be out of work until March 20, 2007 (Tr. 685).

On January 30, 2007, Dr. Eric Loudermilk, a pain specialist, initially evaluated the plaintiff for a possible implantation of a spinal cord stimulator for chronic right buttock, hip, and leg pain. The plaintiff reported severe pain in her right hip and lower back, which radiated down her entire right leg to her right foot. She also reported coldness in her leg and foot and numbness, tingling, burning, and pins and needle sensations. The plaintiff indicated injections had not helped but that her medications did help her nerve pain. Dr. Loudermilk noted that the plaintiff had mild depression. On examination, the plaintiff was in mild to moderate distress. She had mild tenderness over lower lumbar spinous processes and mild tenderness over the right lower lumbar paraspinous muscles. The plaintiff had a lot of tenderness over the right hip and hip bursa to deep palpation. Patrick's test, inversion and eversion of the right hip, and straight leg raise all produced pain. The plaintiff had a slight decrease in light touch throughout her right leg and some temperature changes in the right leg. The plaintiff had decreased strength in flexion and extension of the right leg mainly due to pain. Her gait was slightly ataxic, and she walked with a limp, favoring her right leg. Dr. Loudermilk's impressions were mechanical right hip pain, status post work-related injury; neuralgia of the right leg, status post work-related injury; and, mild depression. Dr. Loudermilk gave the plaintiff information to review on spinal cord stimulation. He indicated that she may have suffered a nerve injury and may have developed some reflex sympathetic dystrophy in the right leg. Dr. Loudermilk ordered an EMG. He recommended an increased dose of Lyrica and started the plaintiff on Lidoderm patches and Cymbalta. Dr. Loudermilk also continued the plaintiff's Lortab (Tr. 757-59).

On February 8, 2007, the plaintiff had an EMG and nerve conduction studies of the left leg, which were essentially normal except for mildly prolonged left Tibial H reflex compared to the right (Tr. 679-81).

9

On March 20, 2007, Dr. Redmond evaluated the plaintiff for right hip and low back pain.  Dr. Redmond noted the EMG did not show significant sciatica.  Dr. Redmond stated that the plaintiff had responded nicely to the Lidoderm patches and noted that she was going to receive a test spinal cord stimulator (Tr. 682).  Dr. Redmond wrote for the plaintiff to remain out of work until May 1, 2007 (Tr. 683).

On April 19, 2007, Dr. Loudermilk noted that he had started the plaintiff on Lyrica, Cymbalta, and Lidoderm patches two months earlier, but the plaintiff had to stop taking Cymbalta due to suicidal thoughts.  The plaintiff requested a different antidepressant and noted that she needed a refill of Lortab since the previous prescribing physician could not refill this medication since the plaintiff was going to pain management.  Dr. Loudermilk indicated that the plaintiff may be a good candidate for a spinal cord stimulator.  He diagnosed right lower extremity neuralgia and mechanical right hip pain, both status post work-related injury, and improved mild depression (Tr. 499).

On April 25, 2007, the plaintiff was seen at the RCMC for right shoulder pain. The plaintiff had noticeable "grinding and popping" over the AC joint (Tr. 667).

On May 1, 2007, Dr. Redmond evaluated the plaintiff for right leg, right hip, and back pain.  The plaintiff reported that she had fallen.  She also reported having more back spasms and pain.  The plaintiff requested Ultram, and Dr. Redmond indicated that he would give her narcotic medication to help with daytime pain (Tr. 469).  Dr. Redmond provided out of work slips between May 1, 2007. and February 5, 2008 (Tr. 471-75.)

On May 17, 2007, Dr. Loudermilk reevaluated the plaintiff for continued leg pain.  The plaintiff indicated that she wanted to "exhaust her options with medications" before getting the spinal cord stimulator implant.  Dr. Loudermilk noted that the plaintiff was compliant with her medications and appointments, and he refilled her medications (Tr. 498).

On June 12, 2007, Dr. Redmond noted that the plaintiff had seen the pain clinic and was being managed with medications.  Dr. Redmond stated that the plaintiff had

a "chronic aggressive pain." He indicated that the pain clinic was helping the plaintiff, but her hip continued to be painful bothering her gait and sleep. The plaintiff reported trying to "get off" some of her medications. Dr. Redmond's impression was "chronic hip pain." He recommended continued exercise, therapy, and medication management (Tr. 468).

On June 14, 2007, Dr. Loudermilk reevaluated the plaintiff and noted that her pain was "typical of neuralgia[,] however all of her tests and studies have been negative including nerve conduction studies." Dr. Loudermilk refilled the plaintiff's medications and increased her dose of Lexapro (Tr.497).

On June 25, 2007, Dr. Redmond gave the plaintiff a right hip injection (Tr. 450-53. On July 12, 2007, Dr. Loudermilk noted that the plaintiff's depression was improved with the increased dose of Lexapro. The plaintiff reported that her hip injection had not helped much. Dr. Loudermilk indicated that the plaintiff had made progress with medication treatment and did not want to proceed with the spinal cord stimulator at that time. Dr. Loudermilk refilled the plaintiff's prescriptions for Lortab, Lyrica, and Lidoderm patches and again increased her dose of Lexapro (Tr. 496). On August 15, 2007, the plaintiff had continued pain in her right lower back and leg despite her medications. Dr. Loudermilk noted that the plaintiff continued to have problems with falling and had recently fallen and injured her lower back. Dr. Loudermilk informed the plaintiff that he was unable to treat her lower back pain because it was not directly related to her worker's compensation injury. The plaintiff reported being interested in proceeding with the spinal cord stimulator because she was not getting adequate relief. Dr. Loudermilk indicated that this request was appropriate, and he gave her additional information to review and refilled her medications (Tr. 494). On September 12, 2007, Dr. Loudermilk discussed implantation of a spinal cord stimulator. He stated that the plaintiff was an "excellent candidate" for the stimulator, which would help wean her off of some of her medications if it was successful. Dr. Loudermilk refilled the plaintiff's medications and indicated that he would schedule

Stage 1 of implantation pending insurance approval (Tr. 493).  On October 1, 2007, Dr. Loudermilk performed Stage 1 spinal cord stimulator electrode implantation (Tr. 492).

On October 5, 2007, Dr. Loudermilk indicated that the plaintiff received excellent results with the trial spinal cord stimulator.  Dr. Loudermilk removed the trial spinal cord electrode and refilled the plaintiff 's medications.  He recommended proceeding with the next stage of implanting the spinal cord stimulator (Tr. 488).

On October 26, 2007, Dr. Redmond's physician's assistant, Emmit Carter, evaluated the plaintiff 's hip pain.  The plaintiff reported no relief from her prior injection and stated that she occasionally has a "clicking" in her hip.  Mr. Carter noted that the plaintiff had been started on Lexapro and that she was interested in seeing a psychiatrist.  Mr. Carter agreed that this would be beneficial for her chronic pain.  On examination, the plaintiff had pain with flexion and extension of her hip.  Mr. Carter's impression was right hip pain and lumbar radiculopathy (Tr. 467).

On November 5, 2007, the plaintiff was admitted to the hospital for completion of the implantation of a spinal cord stimulator.  The plaintiff's discharge medications included Percocet, Duricef, Lexapro, Lyrica, Celebrex, and Lidoderm patches (Tr. 483-87). On November 12, 2007, Dr. Loudermilk removed the plaintiff's staples and refilled her medications, including Lortab, Lexapro, Lyrica, Lidoderm patches (Tr. 482).  On November 19, 2007, Dr. Loudermilk noted that she was "doing well."  The plaintiff reported excellent pain relief in her left leg.  The plaintiff also reported feeling very depressed over the past several weeks.  Dr. Loudermilk gave the plaintiff samples of Effexor to take along with Lexapro.  He recommended continued use of all the plaintiff's other medications (Tr. 481).

On December 4, 2007, Dr. Redmond noted the plaintiff's arthroscopic debridement helped to localize the pain in her right hip area, but not in her back or leg.  The plaintiff reported that Celebrex was not helping her as well, and Dr. Redmond indicated that he would switch the plaintiff's anti-inflammatory (Tr. 466).

On December 10, 2007, Dr. Loudermilk noted that the plaintiff was pleased with her pain management. The plaintiff reported a big improvement in her depression with the addition of Effexor. Dr. Loudermilk refilled the plaintiff's Lortab, Lyrica, Celebrex, Lexapro, Effexor, and Lidoderm patches (Tr. 480). On January 8, 2008, the plaintiff's spinal cord stimulator was working well, and she was pleased with the results of the implant. The plaintiff reported having continued problems with falling down due to weakness in her leg. Dr. Loudermilk indicated that the plaintiff was compliant with treatment, and he refilled all of her medications (Tr. 479). On March 6, 2008, the plaintiff reported falling again several weeks prior but not sustaining any damage. Dr. Loudermilk noted that the plaintiff had some Lortab left over indicating this showed that she was receiving better results with the spinal cord stimulator. Dr. Loudermilk hoped that the plaintiff would continue to improve and require less narcotic pain medication. Dr. Loudermilk refilled all of the plaintiff's medications (Tr. 478).

On April 1, 2008, the plaintiff was seen at the RCMC for complaints of depression, poor sleep, and bad dreams. It was noted that the plaintiff suffered from chronic pain and obsessive compulsive symptoms. The plaintiff was diagnosed with mood disorder, likely obsessive compulsive disorder or bipolar disorder. She was referred to the mental health clinic and prescribed trazodone for sleeplessness (Tr. 663).

On April 11, 2008, the plaintiff had an intake evaluation at the Oconee Mental Health Clinic. She reported that her mood was adversely affected by not being able to work since a work-related injury. The plaintiff presented with racing thoughts and expansive moods. She reported being depressed and having trouble getting out of bed but appeared happy and was dressed somewhat provocatively. It was noted that although the plaintiff reported her problems stemmed from her physical injuries, she seemed to have an underlying mental health issue as well. The plaintiff was given the provisional diagnoses

13

of adjustment disorder with depressed mood and a Global Assessment of Functioning ("GAF")[4] score of 60 (Tr. 717-27).

On May 2, 2008, Dr. Loudermilk noted that the plaintiff had fallen in the shower several times and that he was concerned that she would damage her stimulator electrode or connection cable. The plaintiff reported that Effexor was not helping her depression. Dr. Loudermilk switched the plaintiff's depression medication from Effexor to Cymbalta and referred her for psychiatric care. Dr. Loudermilk refilled the plaintiff's other medications and prescribed a shower chair to help prevent falls (Tr. 598).

On May 16, 2008, Dr. Raul A. Paez of the Oconee Mental Health Clinic initially evaluated the plaintiff at Dr. Loudermilk's referral. The plaintiff reported staying depressed, not being able to focus, and feeling like "everything is closing in on me." Dr. Paez's diagnosis was "rule out bipolar disorder." He prescribed Abilify and Depakote (Tr. 519).

On May 18, 2008, Dr. Loudermilk opined that the plaintiff had excellent results from her spinal cord stimulator and had reached maximum medical improvement. He stated that the plaintiff would require future office visits for management of medications for pain and depression resulting from her injury. He also stated that the plaintiff would need several battery changes for her spinal cord stimulator over her lifetime. Dr. Loudermilk indicated that the plaintiff's impairments from her injury were permanent (Tr. 597).

On June 20, 2008, Dr. Paez reevaluated the plaintiff for symptoms of paranoia, nervous energy, and sleep disturbance. Dr. Paez diagnosed adjustment disorder with depressed mood and a GAF score of 55. Dr. Paez indicated that continued treatment was needed for "unstable" symptoms (Tr. 517-18).

---

[4]A GAF score is a number between 1 and 100 that measures "the clinician's judgment of the individual's overall level of functioning." *See* Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (Text Revision 4th ed. 2000) ("*DSM-IV*"). A GAF score of 51-60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.*

14

On June 30, 2008, Dr. Loudermilk noted that the plaintiff continued to have a lot of pain in her right hip, which he felt was due to arthritis or bursitis. Dr. Loudermilk indicated that the plaintiff understood that the spinal cord stimulator would not help with her hip pain. The plaintiff reported mood swings and seeing a psychiatrist. She was "pleased with her pain management," and Dr. Loudermilk refilled her prescriptions (Tr. 596).

On July 9, 2008, a Physical Residual Functional Capacity ("RFC") Assessment was completed by Dr. Frank Ferrell, a non-examining doctor on contract to the Administration. He found the plaintiff capable of lifting and carrying 20 pounds occasionally and ten pounds frequently, standing/walking about six hours in an eight hour workday, and sitting about six hours in an eight hour workday. Dr. Ferrell limited the plaintiff to climbing ladders, ropes, and scaffolds occasionally and performing all other postural abilities frequently. Dr. Ferrell also indicated that the plaintiff would need to avoid concentrated exposure to hazards (Tr. 520-27).

On July 14, 2008, C. David Tollison, Ph.D., performed an independent medical examination of the plaintiff for chronic pain and associated psychological symptoms (Tr. 528-41). The plaintiff reported depression and anxiety problems since surgery following her work-related injury. She reported feeling tense, stressed, nervous, and having trouble relaxing. The plaintiff indicated that she had an obsession with being clean, which included changing her sheets daily, showering two to four times a day, and changing clothes several times during the day. The plaintiff felt overwhelmed by the combination of her physical and psychological symptoms. Dr. Tollison indicated that the plaintiff's self-insight appeared "marginal." The plaintiff admitted to having sleep impaired by her pain and reported that she wakes up crying "because I hurt so bad." On examination, the plaintiff was appropriately oriented, had adequate memory, and had an estimated intelligence to be in the average range. Dr. Tollison noted that the plaintiff ambulated with a straight cane. The plaintiff's mood was anxious, and she exhibited a moderate intensity of psychomotor

15

agitation. The plaintiff had a blunted affect and constricted facial expression. Dr. Tollison stated that the plaintiff was polite and cooperative and "appears depressed, agitated, and somewhat restless." Dr. Tollison administered the Pain Patient Profile ("P-3"), which was statistically valid with no signs of test manipulation or symptom embellishment. Test results showed depression scores in the top 20th percentile nationally, average anxiety scores, and no suggestion of somatic preoccupation. Dr. Tollison also administered the Minnesota Multiphasic Personality Inventory ("MMPI") test, which was statistically valid and considered to show a true level of psychological function. Test results showed a primary elevation in depression and a secondary elevation in anxiety symptoms with somatic concerns. Dr. Tollison stated that the results of the P-3 test and MMPI testing were consistent. The plaintiff reported very sedentary and simple daily activities, noting that she is unable to engage in exertional chores and has help from her boyfriend. Dr. Tollison's diagnoses included adjustment disorder with mixed anxiety and depression, rule out bipolar disorder, rule out obsessive compulsive disorder, chronic pain, and a GAF score of 55 to 60. Dr. Tollison indicated that, based on his evaluation of the plaintiff record review and objective test results, the plaintiff suffered from a "a Class 3 (moderate) psychological impairment in activities of daily living, a Class 3 impairment in social functioning, a Class 4 (marked) impairment in concentration, persistence or pace, and, a Class 4 psychological impairment in adaptation to stressful condition." These ratings were from the AMA Guides, 5th edition. Dr. Tollison opined that the plaintiff's impairments were "related to her work injury of July 2003, the failure of surgery to relieve pain and restore functioning, and residual pain and functional impairment." Dr. Tollison indicated that he would defer to Dr. Loudermilk with regard to the plaintiff's physical impairment (Tr. 532).

On July 28, 2008, Spurgeon N. Cole, Ph.D., performed a consultative examination of the plaintiff at the Commissioner's request. Dr. Cole noted that the plaintiff appeared to have average cognitive ability and adequate memory. Dr. Cole indicated that

16

the plaintiff's affect was mildly constricted and her mood was mild to moderately depressed. The plaintiff reported that her disability was due to problems with her back, hip, and leg. Dr. Cole indicated that the plaintiff had no problems following simple as well as fairly complex instructions. He indicated that the plaintiff had mildly to moderately impaired social functioning and was rather anxious around unfamiliar people. Dr. Cole noted that the plaintiff related well to him and did not appear unduly anxious, but had met him informally on a previous occasion. Dr. Cole's impression was depression, not otherwise specified ("NOS"), and generalized anxiety disorder, mild to moderate. He indicated that he saw no evidence of bipolar disorder and was unsure why the plaintiff was taking such strong medications. Dr. Cole stated that the plaintiff might need employment where she did not have to work directly with the public (Tr. 543-45).

On August 5, 2008, Robert A. Moss, Ph.D., performed a psychological evaluation of the plaintiff for consideration of whether the plaintiff's bipolar disorder had been aggravated by her physical injury (Tr. 546-70). Dr. Moss noted that the plaintiff received "excellent results" from her spinal cord stimulator but had an increase in her psychological symptoms afterwards. Dr. Moss performed a clinical evaluation and administered the Personality Assessment Inventory ("PAI") and Millon Clinical Multiaxial Inventory III ("MCMI-III"). The plaintiff reported sleep disturbances due to her pain, low energy, high appetite, memory and concentration problems, and crying spells. The plaintiff also reported a dysphonic mood; feelings of helplessness, hopelessness, and uselessness; feelings of guilt; little enjoyment in activities; frequent anxiety; frustration over her inability to do things; and irritability and snapping. The plaintiff indicated that these symptoms had progressively worsened until Dr. Loudermilk started her on antidepressants and had remained at the same level since then. Dr. Moss indicated that the plaintiff was appropriately oriented. Her mood was depressed. The plaintiff also reported falling several times, which "scared" her but did not cause serious injuries. Dr. Moss stated that the

17

plaintiff "moved slowly with a cane, consistent with her reported pain" and that her "pain behaviors did not appear overly exaggerated." The plaintiff's memory appeared intact, and her judgment appeared limited. Dr. Moss indicated that PAI testing was considered valid and showed "a person with significant thinking and concentration problems, accompanied by prominent distress and dysphoria." The diagnostic consideration was major depressive disorder. MCMI-III testing did not show bipolar disorder, rather test results were consistent with major depressive disorder, somatization disorder, and adjustment disorder with anxiety. Dr. Moss diagnosed major depressive disorder, moderate to severe; pain disorder associated with psychological factors and general medical condition; chronic pain and weight gain; and a GAF score of 50.[5] Dr. Moss recommended that the plaintiff receive psychological treatment (Tr. 548).

On August 6, 2008, the plaintiff was seen at the RCMC for complaints of difficulty concentrating. The plaintiff's medications were reviewed and adjusted (Tr. 656).

On August 15, 2008, a Psychiatric Review Technique Questionnaire was completed by Craig Horn, Ph.D., a non-examining doctor on contract to the Administration. Dr. Horn indicated that the plaintiff had medically determinable impairments causing mild restriction of daily activities, mild difficulty in maintaining social functioning, and mild difficulty in maintaining concentration, persistence, and pace (Tr. 571-84).

On August 20, 2008, Dr. George R. Bruce performed an independent medical examination of the plaintiff for her orthopedic problems. Dr. Bruce performed a physical examination, reviewed numerous records, and elicited a detailed history from the plaintiff. The plaintiff reported that her pain radiates down into her right hip area. The plaintiff also reported that her back pain leads to depression and anxiety, which she knows "further

---

[5]. A GAF score of 41-50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR moderate difficulty in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *See DSM-IV*, 32-34.

18

amplifies her pain." Dr. Bruce indicated that the plaintiff presented as an "obviously depressed and an anxious lady with an extremely flat affect." The plaintiff ambulated with a cane and tended to "support her right foot," which she reported goes numb and causes her to fall. The plaintiff had a "sacral flexion angle of 60%, total flexion of 110%, giving her a true flexion of 50%, external extension of 15%, left deviation of 30%, and right deviation of 30%." The plaintiff was able to toe and heel walk. The plaintiff reported that without her spinal cord stimulator, she was unable to do any of these movements. The plaintiff had subjective numbness in her right foot. Dr. Bruce noted Dr. Tollison's impairment ratings regarding the plaintiff's depression and anxiety. Dr. Bruce stated, to a reasonable degree of medical certainty, that the plaintiff's pain had "rapidly caused her to become extremely depressed and anxious, which is persistently up to this present time." He indicated that the plaintiff's range of motion testing of her back was "misleading" because of her pain stimulator. Dr. Bruce felt that the plaintiff had a "pain disorder associated with both psychological factors and general medical problems, which makes it genuine to her." Dr. Bruce stated that he did not feel that the plaintiff was "capable of maintaining any type of productive job, from either the psychological or the physical capability, having to use her cane and having intermittent falls with numbness in her right foot." Dr. Bruce noted that the plaintiff's daily activity form showed that she was unable to do most of her activities of daily living on her own, falling into the "moderate to severe" impairment class regarding psychological impairment. Dr. Bruce stated that the plaintiff would need continuing treatment (Tr. 585-88).

On August 24, 2008, Dr. Loudermilk completed a physical assessment form regarding the plaintiff. Dr. Loudermilk indicated that in a typical eight hour day, the plaintiff could sit for four to six hours. She could sit for "less than 2 hours" at a time, without interruption. Dr. Loudermilk indicated that the plaintiff did require a cane for stability but would not need to elevate her legs during the course of an eight hour work day. Dr.

19

Loudermilk stated that she would need to "change positions, at will, between sitting and standing." He indicated that the plaintiff would need to "lie down/recline, as needed, during the work day to relieve pain" probably three to four times per day. She was "severely" limited in balancing and was "moderately to severely" limited in kneeling, squatting, crouching, and crawling. Dr. Loudermilk indicated that the plaintiff's pain was present to such an extent as to be "distracting to adequate performance of daily activities or work." He also stated that physical activities would "greatly" increase her pain to "such a degree as to cause distraction from the task or even total abandonment of the task" (Tr. 590-91).

On August 27, 2008, Dr. Loudermilk noted that the plaintiff's spinal cord stimulator was providing good relief of her right lower extremity pain. The plaintiff reported seeing a psychiatrist and therapist and taking Abilify to help with mood swings and bipolar disorder. Dr. Loudermilk noted that the plaintiff continued to take Lortab, Celebrex, Lyrica, Cymbalta, and Lidoderm patches. The plaintiff reported trying to be more active and functional. Dr. Loudermilk refilled the plaintiff's prescriptions (Tr. 595).

On August 29, 2008, Dr. Paez evaluated the plaintiff for symptoms of hyperactivity, sleep disturbance, and depression. Dr. Paez diagnosed adjustment disorder with depressed mood. He refilled her prescriptions for Cymbalta and Lexapro (Tr. 606-07).

On September 11, 2008, Dr. Redmond indicated that he had just finished giving deposition testimony regarding the plaintiff and had testified that she had a lower extremity impairment of 27% according to the AMA Guides to Permanent Impairment. Dr. Redmond explained that this rating combined the rating from the plaintiff's neuropathic pain and complex regional pain syndrome ("CRPS") with her chronic hip trochanteric bursitis. Dr. Redmond stated that the plaintiff had reached maximum medical improvement the last time he had seen her (Tr. 760).

On September 29, 2008, a Psychiatric Review Technique Questionnaire and Mental RFC Assessment were completed by Larry Clanton, Ph.D., a non-examining doctor

20

on contract to the Administration (Tr. 613-30).  Dr. Clanton indicated that the plaintiff had medically determinable impairments causing mild restriction of daily activities; moderate difficulty in maintaining social functioning; moderate difficulty in maintaining concentration, persistence, and pace; and no episodes of deterioration.  Dr. Clanton indicated that the plaintiff's impairments were severe but would not preclude the performance of simple, routine work activities (Tr. 629).

On October 1, 2008, a Physical RFC Assessment was completed by Dr. Dale Van Slooten, a non-examining doctor on contract to the Administration.  He found the plaintiff capable of lifting and carrying 20 pounds occasionally and ten pounds frequently, standing/walking about six hours in an eight hour workday, and sitting about six hours in an eight hour workday.  Dr. Van Slooten limited the plaintiff to balancing and climbing ramps and stairs frequently and performing all other postural abilities occasionally.  Dr. Van Slooten also indicated that the plaintiff would need to avoid concentrated exposure to hazards (Tr. 631-38).

On October 24, 2008, Dr. Loudermilk reevaluated the plaintiff.  He noted that the plaintiff was compliant with treatment and refilled her medications.  Dr. Loudermilk also noted that the plaintiff was seeing a psychiatrist who prescribed Abilify (Tr. 642).

On November 26, 2008, Dr. Paez evaluated the plaintiff for depression.  Dr. Paez noted that the plaintiff's GAF score was 55, and he refilled her medications (Tr. 655).

On January 2, 2009, Dr. Loudermilk noted that the plaintiff was upset over the death of her father.  Dr. Loudermilk indicated that the plaintiff's spinal cord stimulator and medications helped with managing her pain and she was pleased with the results.  Dr. Loudermilk added Voltaren Gel for the plaintiff's right hip arthritis and bursitis and refilled her other medications (Tr. 641).  On April 17, 2009, the plaintiff reported seeing a new psychiatrist and that she was no longer taking Abilify.  A surprise drug screen showed that

the plaintiff was taking Lortab as prescribed, and Dr. Loudermilk refilled her medications (Tr. 640).

On April 29, 2009, and May 20, 2009, Dr. Paez evaluated the plaintiff for medication monitoring.  It was noted that the plaintiff's insomnia was improved on Rozerem. The plaintiff was given a GAF score at 60, and her medications were refilled (Tr.648-51).

On July 13, 2009, Dr. Loudermilk evaluated the plaintiff and indicated that she was doing well.  He noted that the plaintiff had not received any benefit from Abilify, which was very expensive, so she was switched back to Cymbalta and Lexapro.  Dr. Loudermilk refilled the plaintiff's medications, including Lortab, Lyrica, Celebrex, and Lidoderm patches (Tr. 671).

On August 31, 2009, Dr. Paez evaluated the plaintiff for a new patient intake. The plaintiff reported physical complaints stemming from a work-related injury and falling often due to numbness in her right hip, leg, and foot.  Dr. Paez noted symptoms of PTSD and major depressive disorder including insomnia, restricted affect, irritability, weight gain, and depressed mood. Dr. Paez noted that the plaintiff "walked slow, with a cane for years." The plaintiff was appropriately oriented with a depressed mood and blunted affect.  Dr. Paez's impression was mood disorder due to work accident.   He diagnosed major depression, single episode, due to fall at work; and a GAF score of 50.  Dr. Paez advised continued treatment with antidepressants (Tr. 728-29).   On this date, Dr. Paez also completed a Psychiatric Review Technique form on which he indicated that the plaintiff had medically determinable impairments causing extreme restriction of daily activities; extreme difficulty in maintaining social functioning;extreme difficulty in maintaining concentration, persistence, and pace; and three episodes of deterioration (Tr. 730-43).

On September 10, 2009, Dr. Loudermilk noted that the plaintiff had been having trouble with drowsiness during the day and felt this was due to her medications.  The plaintiff had been compliant with treatment, and Dr. Loudermilk refilled her medications.

He added Nuvigil for daytime somnolence (Tr. 745). Dr. Loudermilk provided a brief statement indicating that the restrictions he provided on August 24, 2008, still applied and that the plaintiff did not have any additional restrictions since that time (Tr. 744). On November 10, 2009, Dr. Loudermilk indicated that Nuvigil had helped the plaintiff with daytime somnolence. He reviewed and renewed all of the plaintiff's medications (Tr. 768). On January 8, 2010, Dr. Loudermilk refilled her medications (Tr. 767). On March 4, 2010, Dr. Loudermilk noted that the plaintiff appeared to be in a "manic phase." The plaintiff was in good spirits but felt she would benefit from counseling. Dr. Loudermilk indicated that the plaintiff had "a lot of emotional issues including depression and probable bipolar disorder." Dr. Loudermilk stated that the plaintiff's chronic pain affected her emotional issues and that she would benefit from the care of a psychologist. Dr. Loudermilk refilled the plaintiff's medications and referred her to Dr. Michael Kriegel for a psychological examination (Tr. 765-66, 769).

On June 1, 2010, Dr. Loudermilk provided a statement regarding his treatment of the plaintiff's chronic pain from her sciatic nerve injury. Dr. Loudermilk stated that the plaintiff had consistent complaints of pain; she had consistency of her complaints with the sort of pain expected from sciatica; she was diligent in coming to the clinic for treatment; she was highly cooperative with treatment and motivated; she never ran out of medications; and she never exhibited drug seeking behavior. Dr. Loudermilk stated that the plaintiff had some impairment to her attention and concentration resulting from the medication she took to control her pain. Dr. Loudermilk noted that the plaintiff's diagnostic tests were "fairly benign" but explained that an MRI is only a view of the structures of the spine and it is not uncommon to get a false negative EMG result. Dr. Loudermilk stated that the plaintiff's excellent response to the spinal cord stimulator demonstrated that her pain was "almost certainly neurological." Dr. Loudermilk also explained that the plaintiff "started from a fairly severe level of impairment;" so even when it is stated that she received an "excellent

response," she was "still significantly impaired." Dr. Loudermilk stated that the plaintiff had some degree of psychological impairment and some degree of depression resulting from her physical condition. Dr. Loudermilk noted that he personally observed spells of mania in his office but would defer to mental health specialists for the plaintiff's degree of limitation from her psychological conditions (Tr. 806).

On August 10, 2010, Dr. Paez evaluated the plaintiff for complaints of depression and inability to concentrate. The plaintiff walked with a cane and indicated that she falls if she tries to walk without a cane. The plaintiff's mood was anxious and depressed, and her affect was intense and constricted. Dr. Paez noted that the plaintiff was taking Cymbalta and Lexapro. His diagnoses were depression NOS and anxiety disorder NOS (Tr. 771).

On September 3, 2010, the plaintiff complained of having migraines, and Dr. Loudermilk added Maxalt to the plaintiff's medications for headaches. The plaintiff reported following up with a different psychologist than the one recommended by Dr. Loudermilk because she was upset with Dr. Kriegel's suggestion that she could have multiple personalities. Dr. Loudermilk's assessment was permanent right lower extremity neuralgia status post work-related injury status post spinal cord stimulator implantation with excellent results; mechanical right hip pain due to arthritis and bursitis status post work-related injury; and depression and mood swings and probable bipolar disorder. Dr. Loudermilk refilled all of the plaintiff's medications (Tr. 772). On November 3, 2010, Dr. Loudermilk reevaluated the plaintiff. He indicated that the plaintiff was helping to care for two abused foster children, which was helpful to her from a mental standpoint. Dr. Loudermilk indicated that he was pleased with the plaintiff's progress, and he refilled all of her medications (Tr. 773). On December 30, 2010, Dr. Loudermilk indicated that the plaintiff looked the best he had ever seen her look, noting that helping care for two foster children had helped the plaintiff emotionally. The plaintiff noted that this would not have been possible without her spinal

24

cord stimulator.  Dr. Loudermilk noted that the plaintiff had always been compliant with treatment, and he refilled her medications (Tr. 774).

On February 15, 2011, Dr. Loudermilk completed a questionnaire at the Commissioner's request indicating that the plaintiff had depression, which resulted in a "slight" work-related limitation in functioning (Tr. 775).

On February 25, 2011, Dr. Loudermilk evaluated the plaintiff.  He noted that taking care of the foster children had become very stressful for her and she was relieved that they were back with their parents.  A surprise urine screen showed that the plaintiff continued to be compliant with her medications, and Dr. Loudermilk refilled Lortab, Lyrica, Nuvigil, Cymbalta, Celebrex, Lexapro, Voltaren gel, Lidoderm patches, and Maxalt (Tr. 776-780).

On March 2, 2011, Dr. Paez evaluated the plaintiff for sleep disturbances.  The plaintiff complained that her "whole life is around pain."  Dr. Paez refilled the plaintiff's prescriptions for Cymbalta and Lexapro (Tr. 781).

On March 23, 2011, a Psychiatric Review Technique Questionnaire was completed by Lisa Varner, Ph.D., a non-examining doctor on contract to the Administration (Tr. 782-95). Dr. Varner indicated that the plaintiff had medically determinable impairments causing mild restriction of daily activities; mild difficulty in maintaining social functioning; mild difficulty in maintaining concentration, persistence, and pace; and no episodes of deterioration.  Dr. Varner indicated that the plaintiff's symptoms and impairments imposed only "minimal" limitations on her ability to perform basic work functions (Tr. 794).

On March 24, 2011, a Physical RFC Assessment was completed by Dr. William Crosby, a non-examining doctor on contract.  He found the plaintiff to have no exertional limitations.  Dr. Crosby limited the plaintiff to never climbing ladders, ropes, and scaffolds; to climbing ramps and stairs occasionally; and performing all other postural

abilities frequently.  Dr. Crosby indicated that the plaintiff would need to avoid concentrated exposure to hazards (Tr. 796-803).

On March 28, 2011, Dr. Paez noted that the plaintiff was having suicidal thoughts.  The plaintiff complained of severe pain and migraine headaches.  Dr. Paez added Lithium to the plaintiff's medications (Tr. 808).

On April 22, 2011, Dr. Loudermilk indicated that the plaintiff's spinal cord stimulator was keeping her pain at a manageable level.  Dr. Loudermilk refilled her medications (Tr. 810).

On August 18, 2010, a Psychiatric Review Technique Questionnaire was completed by Richard Kaspar, Ph.D., a non-examining doctor on contract to the Administration (Tr. 812-23).  Dr. Kaspar indicated that the plaintiff had medically determinable impairments causing mild restriction of daily activities; mild difficulty in maintaining social functioning; mild difficulty in maintaining concentration, persistence, and pace; and no episodes of deterioration.  Dr. Kaspar indicated that the plaintiff had only been treated by a primary care physician and her impairments were "less than severe" (Tr. 822).

On August 30, 2010, a Physical RFC Assessment was completed by Dr. Robert Hughes, a non-examining doctor on contract to the Administration.  He found the plaintiff capable of lifting and carrying 20 pounds occasionally and ten pounds frequently, standing/walking about six hours in an eight hour workday, and sitting about six hours in an eight hour workday.  Dr. Hughes limited the plaintiff to never climbing ladders, ropes, and scaffolds; to climbing ramps and stairs occasionally; and performing all other postural abilities frequently.  Dr. Hughes also indicated that the plaintiff would need to avoid concentrated exposure to vibrations and hazards (Tr. 824-30).

On July 6, 2011, Dr. Paez completed a medical assessment form regarding the plaintiff.  Dr. Paez opined that in an eight hour work day the plaintiff could satisfactorily function for only 20% of the time in her ability to deal with ordinary work stresses or in her

ability to function independently. Dr. Paez indicated that the plaintiff could not function at all in her abilities to follow work rules; relate to co-workers; deal with the public; use judgment; interact with supervisors; or maintain attention and concentration. The plaintiff could understand and carry out simple as well as detailed but not complex job instructions for 20% of an eight hour work day. Dr. Paez explained that the plaintiff could not focus or concentrate beyond a couple of minutes and that she was hyperactive, had racing thoughts, and gets paranoid. Dr. Paez stated that in an eight hour work day, the plaintiff was not able to maintain personal appearance, behave in an emotionally stable manner, relate predictably in social situations, or demonstrate reliability for any portion of time. Dr. Paez indicated that the bases for his opinions were the plaintiff's diagnoses of bipolar disorder, mixed; depression; and hyperactivity. Dr. Paez stated that the plaintiff could manage her own benefits. He indicated that the earliest date he could state these symptoms had existed was April 2006 (Tr. 831-32).

### *Vocational Expert Testimony*

At the hearing on August 6, 2011, Mark Leaptrot, a vocational expert, testified (Tr.137-44). He indicated that the plaintiff had past relevant work as a radiation protection technician, a waste treatment operator, and a cashier (Tr. 138-39). The ALJ asked the vocational expert if there would be any past work or other work available for a hypothetical person who retained the capacity of "light work" with "no ladders; no more than occasional push/pull, lower extremity; ability to change positions; I'm going to put occasional on the posturals, that being climbing, balancing, and, if she needs a cane, that would be balancing as well, stooping, kneeling, crawling, all at occasional; and never a ladder." The ALJ added "avoid concentrated exposure to hazards, vibrations. Because of pain level and the depression, I'm going to go with unskilled work." (Tr. 142). She also added "no more than occasional interaction, public" (Tr. 143). The vocational expert indicated that this hypothetical would preclude the plaintiff's past work, but not other work such as a garment

sorter, an office mail clerk, or a routing clerk (Tr. 143). In response to questions from the plaintiff's attorney, the vocational expert indicated that there would be "no work" for an individual who was capable of maintaining "concentration, pace, or persistence no more than a couple of minutes at a stretch" (Tr. 144).

**Plaintiff's Testimony**

At the September 2009 hearing, the plaintiff testified that her stimulator helped her hip pain (Tr. 71-72). She said she did laundry occasionally, but that her boyfriend did all the cooking and grocery shopping (Tr. 73). She said she sometimes drove to the store, did a little reading, watched an hour of television each day, and cared for her own hygiene (Tr. 74-75). The plaintiff testified she could only stand for five minutes and that she did not know if medication was helping her depression (Tr. 77, 84).

At the August 2011 hearing, the plaintiff testified that she does no housework or driving whatsoever and that "people" in the neighborhood do all her housework and cooking. However, she conceded that she drove herself to the hearing (Tr. 114-15).

The ALJ commented that the plaintiff's face, arms, and chest appeared tan from sun exposure. The plaintiff said the color was from a lotion she put on her face (Tr. 117). The ALJ also asked about the plaintiff's foster care activities (Tr. 123-25). The plaintiff conceded that she cared for a toddler and infant for four months, but claimed her aunt "stayed with me a lot" and did all the childcare. The ALJ was surprised that the plaintiff would be approved for foster care, given that the plaintiff claimed she could do almost nothing (Tr. 124-25).

## ANALYSIS

The plaintiff was 50 years old on her amended alleged onset date and was 55 years old on the date of the ALJ's decision (Tr. 217). She has a twelfth grade education and past relevant work experience as a plant operator, cashier, and lab technician (T. 62, 93). As discussed above, the ALJ found that the plaintiff was disabled as March 17, 2011, the

date her age category changed from "a person closely approaching advanced age" to "a person of advanced age." 20 C.F.R. § 404.1563. The plaintiff argues that the ALJ erred in failing to find her disabled prior to that date by failing to give proper weight to the opinions of treating physicians Drs. Loudermilk and Paez.

The regulations require that all medical opinions in a case be considered, 20 C.F.R. § 404.1527(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list: (1) the examining relationship; (2) the length of the treatment relationship and the frequency of the examinations; (3) the nature and extent of the treatment relationship; (4) the evidence with which the physician supports his opinion; (5) the consistency of the opinion; and (6) whether the physician is a specialist in the area in which he is rendering an opinion. *Id.* § 404.1527(c)(1)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005). However, statements that a patient is "disabled," "unable to work," meets the listing requirements, or similar assertions are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. § 404.1527(c)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). Social Security Ruling ("SSR") 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. 1996 WL 374188, at *5. As stated in SSR 96-2p:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in [20 C.F.R. § 416.927]. In many cases, a treating source's medical opinion will be entitled to the greatest

29

weight and should be adopted, even if it does not meet the test
for controlling weight.

*Id.* at *4.

### *Dr. Loudermilk*

In an August 2008 physical assessment, Dr. Loudermilk opined that in a typical eight hour day the plaintiff could sit for four to six hours; sit for "less than 2 hours" at a time, without interruption; required a cane for stability but would not need to elevate her legs during the course of an eight hour work day; would need to "change positions, at will, between sitting and standing"; would need to "lie down/recline, as needed, during the work day to relieve pain" probably three to four times per day; was "severely" limited in balancing and was "moderately to severely" limited in kneeling, squatting, crouching, and crawling. Dr. Loudermilk indicated that the plaintiff's pain was present to such an extent as to be "distracting to adequate performance of daily activities or work." He also stated that physical activities would "greatly" increase her pain to "such a degree as to cause distraction from the task or even total abandonment of the task" (Tr. 590-91).

In a June 2010 statement, Dr. Loudermilk stated that the plaintiff had consistent complaints of pain; she had consistency of her complaints with the sort of pain expected from sciatica; she was diligent in coming to the clinic for treatment; she was highly cooperative with treatment and motivated; she never ran out of medications; and she never exhibited drug seeking behavior. Dr. Loudermilk stated that the plaintiff had some impairment to her attention and concentration resulting from the medication she took to control her pain. Dr. Loudermilk noted that the plaintiff's diagnostic tests were "fairly benign" but explained that an MRI is only a view of the structures of the spine and it is not uncommon to get a false negative EMG result. Dr. Loudermilk stated that the plaintiff's excellent response to the spinal cord stimulator demonstrated that her pain was "almost certainly neurological." Dr. Loudermilk also explained that the plaintiff "started from a fairly

severe level of impairment;" so even when it is stated that she received an "excellent response," she was "still significantly impaired" (Tr. 806).

In Dr. Loudermilk's last opinion, in February 2011, he opined that the plaintiff had only a "slight" work-related limitation due to her mental condition (Tr. 775).

The ALJ assigned "little" weight to Dr. Loudermilk's August 2008 and June 2010 opinions (Tr. 40; *see* Tr. 590-91, 806). She explained that the opinions were not well-supported by clinical evidence and were inconsistent with other substantial record evidence (Tr. 40). Specifically, the ALJ noted that Dr. Loudermilk acknowledged he was not a mental health expert (Tr. 40; *see* Tr. 806). She further noted that his treatment records did not support his opinions with objective clinical evidence, as Dr. Loudermilk himself conceded (Tr. 40; *see* Tr. 806). Moreover, the ALJ noted that treatment notes routinely showed that the stimulator and medication helped the plaintiff's condition (Tr. 40; *see* Tr. 480, 488, 642, 768, 837, 840). The ALJ further found that the opinion was not consistent with other substantial evidence contained in the record as a whole and cited the following evidence in support:  (1)  the August 2006 MRI was relatively unremarkable and thus inconsistent with disabling limitations (Tr. 40; *see* Tr. 443, 701, 703, 806); (2)  Dr. Loudermilk repeatedly stated that the plaintiff suffered no side effects from medications (Tr. 40; *see* Tr. 480, 488, 642, 768, 837, 840); (3)  Dr. Loudermilk repeatedly stated that the plaintiff was doing very well on her medication, and he rarely changed it (Tr. 40; *see* Tr. 480, 488, 642, 768, 837, 840); (4)  the plaintiff saw Dr. Redmond, an orthopedist, much less after the stimulator was implanted, which tended to show reduced symptoms (Tr. 40; *see* Tr. 466); (5)  the August 2008 consultative examination found full strength and no atrophy (Tr. 41; *see* Tr. 586-88); (6)  contrary to Dr. Loudermilk's opinion that the plaintiff could not concentrate, Dr. Cole in his July 2008 exam concluded that the plaintiff could concentrate (Tr. 41; *see* Tr. 545); (7)  Dr. Loudermilk himself noted that Ablify, as well as caring for two small children, helped the plaintiff's mood (Tr. 41; *see* Tr. 641, 773, 774); (8)  Dr. Loudermilk

31

reported in March 2010 that the plaintiff's mood disorder was controlled (Tr. 41-42; *see* Tr. 765); (9)  the plaintiff refused treatment with psychologist Dr. Kriegel, despite Dr. Loudermilk's recommendation, which tended to show her mental complaints were not as bad as she claimed (Tr. 42; *see* Tr. 772); (10) the Oconee Mental Health clinic examinations sometimes found a depressed mood or rapid speech, but were otherwise generally normal (Tr. 42; *see* Tr. 608, 648, 650, 655, 727); and (11)  clinical examination generally assessed a GAF score of 55-60, showing "moderate" symptoms, inconsistent with extreme limitations (Tr. 42; *see* Tr. 518, 606, 649, 655, 671, 729).

The plaintiff argues that the ALJ overlooked Dr. Loudermilk's comment in June 2010 that the April 2006 MRI and February 2007 EMG and nerve conduction study ("NCS") might have missed something (pl. brief 28).  However, the ALJ was correct that these negative clinical findings were inconsistent with Dr. Loudermilk's opinion (Tr. 40; *see* Tr. 443, 701, 703, 806).  The ALJ specifically addressed Dr. Loudermilk's "attempt[] to undermine the results of the negative MRI and relatively normal EMG/NCS" in his June 2010 statement, noting that his "records contain no clinical signs to support his statements in this letter" (Tr. 28).  Specifically, the ALJ noted that in the July 2010 progress note, Dr. Loudermilk simply refilled the plaintiff's medications with no discussion of her symptoms or functioning that would support his opinion (Tr. 28; *see* Tr. 770).  Moreover, in September 2010, he continued to report that the plaintiff was extremely pleased with the results of her spinal cord stimulator (Tr. 28; *see* Tr. 772).  The ALJ further noted that Dr. Loudermilk's treatment notes from 2010 and 2011 continued to indicate that the stimulator and medications were helpful to the plaintiff and he was pleased with her progress (Tr. 29; *see* Tr. 773-74, 776-80, 804-805).

The plaintiff next argues that the ALJ erred by noting Dr. Loudermilk's treatment was very stable and that he often noted overall improvement (pl. brief 28-29). However, the ALJ was correct; Dr. Loudermilk rarely changed the plaintiff's medication and

in follow-ups routinely said she was doing well with no side effects (Tr. 40; *see* Tr. 480, 488, 642, 768, 837, 840). Stable symptoms, in the context of effective treatment, may suggest symptoms that are not disabling. *See, e.g., Garrett v. Astrue*, No. 2:09–0798–JFA–RSC, 2010 WL 1497666, at *5 (D.S.C. Jan. 21, 2010) (ALJ justifiably found claimant described as "stable" by psychiatrist not disabled), *adopted by* 2010 WL 1497556 (D.S.C. April 12, 2010).

The plaintiff next argues that the ALJ erred in finding that Dr. Loudermilk's treatment notes did "not contain clinical signs that would otherwise support his opinions regarding the physical limitations or the claimant's allegations" (pl. brief 29 (citing Tr. 40-41)). The plaintiff contends that Dr. Loudermilk was "not in the habit of noting clinical signs, positive or negative" and "it would be irrational and unfair to deny [her] claim because of a quirk in her doctor's notation system" (pl. brief 29). However, the ALJ is required to consider whether an opinion is supported by relevant evidence, "particularly medical signs and laboratory findings," when weighing opinions. 20 C.F.R. § 404.1527(c)(r). The plaintiff cites *Matthews v. Astrue*, No. 8:08-1919-TLW, 2009 WL 2782088, at *5 (D.S.C. Aug. 28, 2009), for the proposition that silence does not equal inconsistency (pl. brief 29-30). However, as argued by the Commissioner (def. brief 18), the ALJ cited the treatment notes' silence as showing the opinion was not "well-supported" (Tr. 41) rather than inconsistent.

The plaintiff next argues the ALJ erred by observing that the plaintiff did not pursue the psychological treatment Dr. Loudermilk recommended (pl. brief 30; *see* Tr. 772). The ALJ noted that Dr. Loudermilk referred the plaintiff to Dr. Kriegel, a psychologist, but the plaintiff "opted to discontinue treatment with Dr. Kriegel after a short period" (Tr. 36, 42; *see* Tr. 772). Failure to pursue treatment is generally inconsistent with disabling symptoms. *See Mickles v. Shalala*, 29 F.3d 918, 930 (4th Cir. 1994) (difference between alleged symptom severity and treatment sought is "highly probative of the claimant's credibility"). *See also* 20 C.F.R. § 404.1529(c) (treatment is a factor to be considered by an ALJ when

33

assessing the credibility of an individual's statements).  The plaintiff notes that her failure to continue treatment with Dr. Kriegel is irrelevant as she simply began seeing another doctor, Dr. Paez (*see* Tr. 772).  The ALJ specifically considered the plaintiff's treatment by Dr. Paez, as will be discussed below.  To the extent the ALJ erred in drawing a negative inference from the fact the plaintiff did not continue to see Dr. Kriegel, the undersigned finds that such error was at most harmless as the ALJ gave several valid reasons for discounting Dr. Loudermilk's opinion. *See Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination."); *Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994) (finding the ALJ's error harmless where the ALJ would have reached the same result notwithstanding).

Lastly, the plaintiff argues that the ALJ erred in referencing her GAF scores in the 55-60 range (pl. brief 30-31; *see* Tr. 517, 606, 608, 717).  The plaintiff cites *Green v. Astrue*, No. 1:10-1840-SVH, 2011 WL 1770262, at *18 (D.S.C. May 9, 2011), for the proposition that it is "improper to use a GAF in this range [i.e., 55-60] as an inconsistency with a psychological opinion of disability" (pl. brief 31).  However, as argued by the Commissioner, the court in *Green* found error where the ALJ relied too "heavily" on a single GAF score to discount an opinion. 2011 WL 1770262, at *18. Here, the ALJ cited several GAF scores indicating only moderate limitations, rather than just one (Tr. 42; *see* Tr. 517, 606, 608, 717), and also cited other evidence that was inconsistent with Dr. Loudermilk's opinions.  The plaintiff notes that Dr. Loudermilk's opinions were related to her limitations from pain, and thus citation to her GAF scores were irrelevant to an assessment of Dr. Loudermilk's opinion (pl. reply 7).  To the extent the ALJ's citation to the GAF scores in assessing Dr. Loudermilk's opinions of the plaintiff's limitations due to pain was in error, the undersigned finds that such error was at most harmless as the ALJ gave several valid reasons for discounting Dr. Loudermilk's opinion.  The plaintiff also cites the DSM-IV definition and notes that a GAF score of 51-60 can possibly indicate "conflicts with peers

or co-workers" (pl. brief 31). Here, there is no evidence in the record of the plaintiff having such conflicts, and thus this argument is without merit.

Based upon the foregoing, the undersigned finds that the ALJ properly considered the opinions of Dr. Loudermilk, and substantial evidence supports the ALJ's finding that they were entitled to little weight.

### Dr. Paez

In August 2009, Dr. Paez completed a Psychiatric Review Technique form on which he indicated that the plaintiff had medically determinable impairments causing extreme restriction of daily activities; extreme difficulty in maintaining social functioning; extreme difficulty in maintaining concentration, persistence, and pace; and three episodes of deterioration. He further indicated that the plaintiff's impairment satisfied the criteria of Listing 12.04 (Affective Disorders) (Tr. 730-43).

In July 2011, Dr. Paez opined that in an eight hour work day the plaintiff could satisfactorily function for only 20% of the time in her ability to deal with ordinary work stresses or in her ability to function independently. Dr. Paez indicated that the plaintiff could not function at all in her abilities to follow work rules; relate to co-workers; deal with the public; use judgment; interact with supervisors; or maintain attention and concentration. The plaintiff could understand and carry out simple, as well as detailed but not complex job instructions for 20% of an eight hour work day. Dr. Paez explained that the plaintiff could not focus or concentrate beyond a couple of minutes and that she was hyperactive, had racing thoughts, and gets paranoid. Dr. Paez stated that in an eight hour work day the plaintiff was not able to maintain personal appearance, behave in an emotionally stable manner, relate predictably in social situations, or demonstrate reliability for any portion of time. Dr. Paez indicated that the bases for his opinions were the plaintiff's diagnoses of bipolar disorder, mixed; depression; and hyperactivity. Dr. Paez stated that the plaintiff

could manage her own benefits.  He indicated that the earliest date he could state these symptoms had existed was April 2006 (Tr. 831-32).

         The ALJ assigned "little weight" to Dr. Paez's opinions, concluding they were not well-supported by clinical evidence and were inconsistent with other substantial record evidence (Tr. 40).  Specifically, the ALJ noted that Dr. Paez found largely unremarkable clinical signs (Tr. 35, 40; *see* Tr. 517, 608, 648-49, 650, 655).  Furthermore, the ALJ noted that other evidence was inconsistent with Dr. Paez's opinions (Tr. 35, 40), including the following:  (1)  treatment notes from Oconee Mental Health in April 2008 and April and May 2009, signed by a different doctor, were not consistent with disability (Tr. 34-35; *see* Tr. 648-49, 650, 717-27); (2)  Dr. Paez's exam in August 2009 found only a depressed mood and blunt affect, but was otherwise normal (Tr. 35, 42; *see* Tr. 606); (3)  Dr. Paez's July 2011 opinion stated that the plaintiff had suffered bipolar disorder since 2006, when the Oconee Mental Health treatment notes did not consistently diagnose it (Tr. 35, 40; *see* Tr. 517, 608, 650); (4)  Dr. Tollison's mental status exam of the plaintiff was essentially normal (Tr. 36, 41; *see* Tr. 530); (5)  Dr. Cole also found little or no mental abnormality on exam (Tr. 36, 41; *see* Tr. 544); (6)  Dr. Moss's 2008 report concluded the plaintiff did not have bipolar disorder (Tr. 36, 41; *see* Tr. 548); (7)  Dr. Loudermilk's treatment notes show that Abilify helped the plaintiff's mood (Tr. 36, 41; *see* Tr. 596); (8)  the plaintiff cared for two foster children (Tr. 36; *see* Tr. 773-74); (9)  the plaintiff chose not to pursue treatment with Dr. Kriegel, a psychologist Dr. Loudermilk recommended (Tr. 36, 42; *see* Tr. 772); (10)  mental status exams at Oconee Mental Health were generally normal, and the plaintiff was assigned GAF scores in the 55-60 range, indicating only moderate symptoms or limitations (Tr. 36, 42; *see* Tr. 717, 727, 517, 648-50, 655); (11)  Dr. Paez's July 2011 opinion indicates that the plaintiff has been significantly hindered due to bipolar disorder since April 2006; however the earliest Dr. Paez could have examined the plaintiff was April 2008 when she first sought mental health treatment at Oconee Mental Health (Tr. 35; *see* Tr. 717-27); (12)

36

the plaintiff has not required mental health treatment on an inpatient or emergency basis (Tr. 36, 42); and (13) State agency medical consultants indicated on several occasions that a review of the record supported a finding that the plaintiff was not disabled due to mental impairment (Tr. 36-37; *see* Tr. 571-84, 613-30, 782-95, 812-23) .

The plaintiff first argues the ALJ erred by noting the inconsistency between Dr. Paez's opinions and his treatment notes regarding bipolar disorder (pl. brief 32-33). Specifically, the ALJ observed that Dr. Paez did not consistently diagnose bipolar disorder (Tr. 35, 40; *see* Tr. 517, 608, 655); however, he indicated in his July 2011 opinion that it was disabling (Tr. 832). The plaintiff argues this is "insufficient to discount Dr. Paez's opinions" (pl. brief 33). However, as argued by the Commissioner, this was an inconsistency between Dr. Paez's treatment notes and his opinion, which Dr. Paez made no effort to explain. As such, it tended to justify discounting the opinion as one of several inconsistencies the ALJ cited, as discussed above.

The plaintiff next argues that the ALJ should have further evaluated Dr. Paez's conclusion on a matter reserved to the Commissioner (pl. brief 33). The ALJ noted that Dr. Paez's conclusion that the plaintiff met Listing 12.04 (Affective Disorders) was, in effect, an opinion that she was disabled and, further, his own treatment notes did not support this finding (Tr. 40, 42). Thus, the ALJ explained that she discounted this part of Dr. Paez's opinion on the grounds that it was on a matter reserved for the Commissioner and, regardless, the evidence did not support the finding (Tr. 35-36, 40, 42). The plaintiff acknowledges that this was a matter reserved to the Commissioner, but argues that the ALJ "was still required to evaluate Dr. Paez's opinion" (pl. brief 33). This is exactly what the ALJ did. The ALJ specifically found that while Dr. Paez opined in August 2009 that the plaintiff met Listing 12.04, the records from Oconee Mental Health and from Dr. Paez's independent practice did not support this opinion (Tr. 36, 42). The ALJ noted that the treatment records signed by Dr. Paez and other doctors at Oconee Mental Health in April, June, August, and

37

November 2008 and April, May, and August 2009 contained largely unremarkable clinical signs (Tr. 35, 40, 42).  Accordingly, the ALJ adequately explained her finding.

The plaintiff next points out that "Dr. Paez's treatment notes are handwritten, sketchy, and difficult to read" and argues that "[i]t would not be appropriate to penalize [the plaintiff] for [her] doctor's failure to keep detailed and easily legible notes" (pl. brief 33-34).  However, as argued by the Commissioner, the ALJ said nothing about handwriting and described the details of Dr. Paez's treatment notes at length (Tr. 35-37, 40-42).  In reply, the plaintiff argues, "Defense counsel does not refute our claim that some of the legible parts of Dr. Paez's notes are perfectly consistent with disability" (pl. rep. 9-10).  The ALJ specifically cited substantial evidence that was inconsistent with Dr. Paez's opinions, and this allegation of error is meritless.

Lastly, the plaintiff argues that the ALJ's observation that the plaintiff never required emergency or inpatient psychiatric treatment (Tr. 36, 42) was in error because "[t]here is no requirement that a person have inpatient or emergency mental health treatment before the opinion of a long-term treating specialist can be believed" (pl. brief 35).  While this may be true, it is irrelevant.  The ALJ was obligated to consider inconsistencies in the treating physician's opinion.  20 C.F.R. § 404.1527(c).  Dr. Paez opined that the plaintiff was entirely unable to function in most mental areas and had many periods of extended decompensation (Tr. 730-43, 831-32).  The fact that the record shows the plaintiff had no emergency or inpatient mental health treatment and her treatment consisted of followup appointments every few months was an appropriate consideration by the ALJ, and thus there was no error.

Based upon the foregoing, the undersigned finds that the ALJ properly considered the opinions of Dr. Paez, and substantial evidence supports the ALJ's finding that they were entitled to little weight.

## **CONCLUSION AND RECOMMENDATION**

This court finds that the Commissioner's decision is based upon substantial evidence and free of legal error.  Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

June 19, 2014
Greenville, South Carolina